IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IDELFONOSO ESPARZA,**<br><br>Petitioner,<br><br>**v.**<br><br><br>**TIM V. VIRGA, Warden,**<br><br>Respondent. | Case No. **1:13-cv-02035 LJO MJS (HC)**<br><br>**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent is represented by Mark A. Johnson of the office of the Attorney General.

I.    **PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Madera, following his conviction by jury trial on April 20, 2010, for first degree murder, willful discharge of a firearm from a vehicle, and various enhancements. (Lodged Doc. 10, Clerk's Tr. at 251-52.)  On October 14, 2010, Petitioner was sentenced to an indeterminate term of life without the possibility of parole for murder consecutive to a term of twenty-five (25) years to life in state prison for the special allegation of discharging a firearm causing death.

1   (<u>Id.</u>)

2        Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

3 District, which affirmed the judgment on June 11, 2012.  (Lodged Docs. 1-3, <u>People v.</u>

4 <u>Esparza</u>, 2012 Cal. App. Unpub. LEXIS 4319 (June 11, 2012).) On September 12, 2012,

5 the California Supreme Court denied review. (Lodged Docs. 4-5.) Petitioner did not seek

6 collateral review of the conviction in state court.

7        Petitioner filed the instant federal habeas petition on December 12, 2013.  (Pet.,

8 ECF No. 1.) Petitioner presents four claims for relief in the instant petition. Petitioner

9 alleges: (1) that the trial court failed to instruct the jury that it must find corroborating

10 evidence before it could rely on accomplice testimony; (2) ineffective assistance of

11 counsel for failing to object to trial testimony; (3) that the trial court erred by failing to sua

12 sponte instruct the jury regarding voluntary manslaughter; and (4) cumulative error. (<u>Id.</u>)

13 Respondent filed an answer to the petition on April 16, 2014. (ECF No. 16.) Petitioner

14 did not file a traverse. The matter stands ready for adjudication.

15 **II.**    **<u>STATEMENT OF THE FACTS</u>[1]**

16        On the afternoon of April 5, 2004, Madera County Sheriff's
     Lieutenant Michael Salvador was driving eastbound on 5th Street

17      approaching Gateway Drive in the City of Madera. Lieutenant Salvador
     stopped at the intersection and prepared to turn onto Gateway. He heard

18      three gunshots in rapid succession. Salvador looked south and saw two
     individuals run across the street toward a late model Dodge Intrepid

19      parked near a feed store.

20        The two individuals entered the vehicle. One of them, a heavyset,
     bald, Hispanic male, climbed in the window on the passenger side. The

21      Intrepid proceeded northbound, and Salvador unsuccessfully attempted to
     pursue the vehicle. He returned to the area where the Intrepid had been

22      parked. Several witnesses pointed to a cell phone and a piece of paper on
     the ground and said the items belonged to the car that had just left.

23      Salvador contacted the Madera Police Department for assistance.

24        Madera Police Officer Kristine Sauceda went to the scene shortly
     after Salvador heard the shots. She saw two brass nine-millimeter shell

25      casings near the double yellow line on Gateway Drive in front of the feed

26      store. The casings were "RP" brand. Sauceda also saw a silver cell phone

---

27 [1]The Fifth District Court of Appeal's summary of the facts in its June 11, 2012 opinion is presumed correct.
28 U.S.C. § 2254(e)(1).

28

and two folded pieces of paper on the ground near the southwest corner of the feed store. The papers were money order receipts in the sums of $175 and $500. Law enforcement officers later determined the victim of the shooting had used the money orders to pay rent at a realty office across the street.

Madera Police Officer David Herspring spoke with Evie Morfin, an employee of a property management firm inside the realty office. Morfin said the victim of the shooting, George Ganas, was a tenant of the property management firm and had come into the office to pay his rent. After he left the office, Morfin heard two gunshots. She looked out the window of her office and saw an individual getting into the passenger side of a vehicle parked in front of the feed store. The individual was holding his hand to his back, and the vehicle left on Gateway and headed towards 4th Street at a high rate of speed.

At about 1:45 p.m. that day, Madera Police Sergeant Giachino Chiaramonte went to Madera Community Hospital to follow up on a dispatch about a possible shooting victim. Sergeant Chiaramonte went to a room where medical staff members were treating George Ganas, who had sustained a gunshot entry wound to his lower back and had large, fresh abrasions on his left elbow and palm. Sergeant Chiaramonte saw Rick Gallegos pacing in the waiting room.

At about the same time, Madera Police Officer Jason Dilbeck received a report that a shooting victim had died. Officer Dilbeck went to the crime scene and learned the passenger in the black Dodge Intrepid was Rick Gallegos, and Gallegos had gone to Madera Community Hospital. Dilbeck went to the hospital, but Gallegos had already departed. Dilbeck contacted dispatch and learned the shooting victim was the registered owner of a Dodge Intrepid. Dilbeck broadcast a " 'be on the lookout' " request for the vehicle. A short time later, the sheriff's department reported that Rick Gallegos and the Intrepid were located behind a music store.

Dilbeck went to the location and saw the car with the driver's door open. A small amount of blood was present in the middle of the backseat. Lieutenant Salvador identified the vehicle as the one he observed leaving the scene. Officer Herspring noticed blood on the bottom portion of the back of the front passenger seat. He also noticed blood on the seat itself. He said the stains were consistent with someone bleeding from the back and sitting on the seat.

Herspring located a live nine-millimeter bullet wedged in the front passenger seat. He also saw an April 5, 2004, rent receipt from the realty office in the sum of $675, the total of the two money order receipts found at the shooting scene. In the backseat of the Intrepid, officers found a car seat, a television, and a prescription bottle containing marijuana. Herspring determined that George Ganas was the registered owner of the vehicle.

Stephen Avalos, M.D., a forensic pathologist, performed an autopsy on the body of George Ganas on April 9, 2004. He said the cause of death was "a gunshot wound of his trunk, which perforated his liver and grazed his lung and penetrated the left side of his heart." Avalos recovered the bullet from the victim's heart. Officer Dilbeck said the bullet was too

3

deformed for testing, but its diameter was consistent with a nine-millimeter bullet.

On the afternoon of April 5, 2004, California Highway Patrol Officer Mark McAdams was driving westbound on 4th Street in Madera when he located a vehicle heading northbound on G Street at a high rate of speed. Officer McAdams slowed down to avoid a collision with the gray compact vehicle, which ran a stop sign at 45-50 miles per hour. McAdams activated his lights and siren and pursued the vehicle. The vehicle turned and accelerated as he approached.

Officer McAdams saw two individuals in the front seat and three in the back. The latter three appeared to be males with shaved heads. The vehicle went through a stop sign at Gateway Avenue and continued eastbound. McAdams slowed his patrol vehicle but continued in pursuit. The suspect vehicle stopped near an alley between D and E Streets. Three people exited the suspect car and ran down the alley. Officer McAdams did not have a clear view of them. McAdams drew his weapon at the middle rear passenger, C.A., and the driver of the vehicle, Rafael Rodriguez.

Officer Dilbeck went to the scene of the stop and obtained a statement from C.A., who Dilbeck said was 13 years old. C.A. said the shooter of George Ganas was known as "Poncho," "Bashful," and "Bash." He gave a physical description of Poncho and showed officers where the shooter lived. Officers compiled a photographic lineup that included appellant's picture. C.A. identified appellant as the shooter.

On April 9, 2004, Madera police officers executed a search warrant at the address on Cross Street that C.A. had tied to the shooter. Officer Dilbeck found an empty box of nine-millimeter shells and appellant's social security card in the home. On April 22, 2004, Madera police officers went to Rafael Rodriguez's home, searched the premises, and seized four live nine-millimeter rounds. They also seized a photograph of gang members throwing gang signs and bearing gang writing. They also seized a letter written by a Vatos Locos Surenos (VLS) gang member form a prison in San Luis Obispo.

In July 2008, the Madera Police Department ran a "Crime Stoppers" advertisement in the Madera Tribune newspaper about appellant's arrest warrant. The advertisement included a photograph of appellant. In response to the ad, Virginia Yrigollen contacted Madera Police Detective Robert Hill and Detective Sergeant Robert Salas and provided information about appellant's current whereabouts, including a possible address for him. The address was located in Mexico. Detective Hill made a map of the area and faxed the information to the U.S. Marshal in San Diego. The Marshal Service apprehended appellant at the address supplied by Yrigollen and returned him to Madera on July 23, 2008.

Yrigollen testified that she lived with her boyfriend, Felipe Franco, near Mexicali, Mexico in 2004. Their residence was about three and one-half miles from the U.S. border. She said her son, Michael Lopez, visited occasionally and that Franco was appellant's uncle. Both Yrigollen and Lopez testified that appellant goes by the nickname "Poncho." Yrigollen said appellant arrived at her home in June 2004 and stayed about a month. Appellant would also stay at his aunt's house in the Mexicali area.

Yrigollen said appellant's mother, Maria de La Luz Perez, would come to Mexicali and leave money and groceries for appellant.

Yrigollen said she was a close friend of the mother of George Ganas. Yrigollen had known Ganas his entire life and knew he had been shot in Madera. In June 2004, Yrigollen asked appellant about the Ganas shooting, but appellant said he did not remember much. Appellant claimed he had been at home when some friends stopped by to pick him up. Yrigollen said she stopped appellant from giving an explanation because she had a hard time believing his version of events. Yrigollen said she was shocked and upset and really did not want to know what had happened to Ganas. Yrigollen said appellant was making himself look bad by running and told him he should go back and clear matters up. Although appellant did not respond to her advice, Yrigollen said appellant looked at her and "he knew it needed to be done."

Michael Lopez said he knew appellant as the nephew of Yrigollen's onetime boyfriend, Felipe Franco. Lopez saw appellant in Mexico in June 2004. Lopez had known appellant for about 12 years and had been good friends with George Ganas since they were children. Lopez knew that Ganas had been shot and killed. Lopez testified, "My brother told me the story [of the homicide] when I was in Turlock, you know, and just pieces of it, but not the whole ... no one knows the whole story, so he just told me what he knew."

In June 2004, Lopez and appellant had a fight after appellant made some comments about the Ganas shooting. Lopez said he and appellant were drunk on tequila at the time. Lopez did not think that appellant was aware of his friendship with Ganas. Lopez was under the impression that appellant was visiting in Mexico, but appellant said he had done something wrong. Appellant went on to tell Lopez "[t]hat it was a car full of guys and then [appellant] shot, and that was it." Lopez began to argue with appellant and Yrigollen and Franco came outside to intervene in the fight. Lopez told his mother, "He killed George."

At trial, C.A. testified on behalf of the prosecution. C.A. said he was 15 years old in 2004 and had known appellant several years. C.A. met appellant at appellant's house at least an hour before 1:30 p.m. on April 5, 2004. Rafael Rodriguez and two other individuals picked up appellant and C.A. from the house. Appellant got into the front passenger seat and C.A. got into the rear, middle seat. The group left appellant's house and went to a mini-mart at the intersection of Gateway and Yosemite Avenues to buy gasoline.

At the mini-mart, C.A. saw two individuals he had never seen before. C.A. said he was affiliated with the VLS gang at that time. C.A. believed the two individuals at the mini-mart were members of the rival Norteno street gang, based on the way they looked at the occupants of Rodriguez's car and the music they played. C.A. said the two groups exchanged "bad looks" but no derogatory words. One of the individuals who sat in the rear seat with C.A. was a gang member known as "Calacas." C.A. described Calacas's gang affiliation as "southerner." Calacas went inside the mini-mart to pay for the gas, returned to the car, and said the two individuals were Nortenos. As the two individuals left the mini-mart, they displayed a Norteno hand sign with four fingers spread out.

C.A. said he was seated behind Rodriguez and appellant but did not remember hearing them say anything or see them make gestures. A few minutes later, the group in Rodriguez's car departed the store. Surveillance videos at the store depicted Rodriguez, Calacas, and George Ganas, along with the vehicles of Rodriguez and Ganas. The videos were filmed at about 1:40 p.m. on April 5, 2004. Appellant and C.A. did not get out of Rodriguez's vehicle while it was stopped at the store. When the car departed, appellant was still seated in the front passenger seat.

Rodriguez made a right turn and drove northbound on Gateway. As they drove up Gateway, C.A. saw one of the individuals who had been at the store. The man was crossing the street in front of them and walking toward the same dark vehicle C.A. had seen at the store. The car was parked in front of a feed store, and the man appeared to see them. He slowed down his pace while he was in front of Rodriguez's car. Rodriguez slowed his vehicle to avoid hitting the man. The man started to run from the front to the rear of Rodriguez's car and appeared to be "scared for his life." Appellant looked at Rodriguez, as if to obtain permission to shoot the man.

When the man was to the right of Rodriguez's car, he put his hands in the waistband of his pants, as if he were going to pull a weapon. A few seconds later, appellant began shooting. C.A. did not know where appellant got the gun because C.A. had not seen it before. C.A. said it looked like a semiautomatic nine-millimeter handgun. C.A. said appellant's entire arm was extended out of the window of Rodriguez's car. C.A. said the shooting victim was standing about 10 feet away from Rodriguez's car. He ran between Rodriguez's car and the side of the street toward his own car. C.A. said appellant fired as the individual ran past him. Appellant's arm was pointed to the side and back while he fired multiple shots. C.A. said he did not hear any shots other than those fired by appellant.

C.A. said the shooting victim ran from the front to the back of Rodriguez's car and was behind Rodriguez's car when C.A. heard the last shot. C.A. said the victim fell to the ground behind his own car. C.A. said Rodriguez's car was stopped during the shooting and there was traffic in front of his vehicle. After appellant fired the last shot, Rodriguez pulled his vehicle into the oncoming traffic lane and drove away.

After Rodriguez drove away, C.A. noticed a law enforcement car following them. Rodriguez stopped in an alley and the two passengers seated in the rear with C.A. ran away. C.A. and Rodriguez stayed in the car until an officer ordered them out. C.A. said he spoke with officers, told them what happened, and identified where appellant lived. C.A. said he was concerned about retaliation against his family. C.A. also said he received no promises from the office of the district attorney in exchange for his testimony.

Officer Dilbeck testified he was a member of the Madera Community Response Unit and qualified as a criminal street gang expert without objection. Dilbeck said the VLS criminal street gang is a subset of the Surenos, who operate under the direction of the Mexican Mafia prison gang. Officer Dilbeck described four predicate offenses committed by VLS members. In his opinion, the conviction of VLS members for these predicate offenses demonstrated a pattern of violent gang conduct by the

Surenos. Dilbeck also concluded that appellant is a member of the VLS criminal street gang. He based his opinion on the facts of this case and police reports relating to appellant's participation in previous gang-related altercations, such as gang-related fights in September 1998, February 1999, and October 1999.

Officer Dilbeck also described a number of gang-related criminal offenses involving appellant, including a November 1999 petty theft accusation; an April 2001 traffic stop; a February 2003 traffic stop in which appellant fled and was caught in possession of methamphetamine; a March 29, 2004, traffic stop; and an undated incident in which he and another gang member were assaulted by perpetrators dressed like Nortenos.

Officer Dilbeck also based his opinion about appellant's gang membership on appellant's self-identification as a VLS gang member. During his July 23, 2008, booking in this case, appellant indicated he was a "southerner from VLS" and said his moniker was "Little Bashful." Appellant also identified himself as a Sureno gang member during a 2003 custodial classification.

In Dilbeck's opinion, George Ganas was a Norteno gang member who associated with other Nortenos on a regular basis. Dilbeck said Ganas had problems with VLS members prior to April 2004. The VLS members had chased Ganas on several occasions and on one occasion the VLS members "jumped" Ganas at a park. He concluded "there was a rivalry between them."

Defense Evidence

Appellant testified on his own behalf and said he did not shoot or kill George Ganas. Appellant said he was at his mother or girlfriend's home on April 5, 2004. In 2004, he lived in Susanville with his sister and brother-in-law. Appellant said he stayed with them for several months while he attended a semester of college. Appellant said his goal was to become a mechanic. Appellant said he held a part-time job at a fast food store and played soccer.

During his semester in Susanville, appellant returned to Madera periodically and would stay with his mother or his girlfriend, Melissa. Appellant said he did not contact Madera friends who were gang members because he did not want to get into any more trouble and knew he would be in violation of his probation if he associated with them. Appellant said on one occasion he was walking from his mother's home to Melissa's home and some gang members tried to pick him up. When appellant told them he did not want to go with them, the gang members called him names.

Appellant said that after gang members knew he was in town, they would go to his mother's house to look for him. Appellant said he was scared of them because they always traveled in groups. He became angry when they arrived at his mother's home, and he told his mother to tell them he was not at home. Appellant began to go to his girlfriend's home to avoid them.

Appellant said his mother gave him a hard time for associating with

7

gang members. Appellant's mother, Maria de la Luz Perez, testified that gang members beat appellant up. After they did so, she decided to take appellant to live with her father in Mexico. Appellant did not like the idea, but he knew he was in danger in the Madera area, and it would not be easy for him to leave the gang.

Mrs. Perez testified she took appellant to his grandfather's home in San Felipe, Mexico about one month before police searched her home on April 9, 2004. At that time, she did not know anything about the Ganas shooting. During the April 9, 2004, search of her home, she told police officers that appellant was staying with her father in Mexico. **[fn3]** After appellant lived with his grandfather for about three months, his mother took him to live with her brother, Franco, and his girlfriend, Yrigollen. Mrs. Perez said she periodically visited Mexico and provided appellant with money and a car.

> **FN3**: According to Madera Police Officer Michael Powell, one of the officers who conducted the search, Mrs. Perez said she did not know appellant's exact whereabouts but indicated he had been in New Mexico for about three weeks.

Appellant testified he lived with his uncle for several months. At that point, Yrigollen asked appellant, " 'Why are you here [in Mexico] after so many months later?' " He said, "I told her that ... because of the gangs coming around looking for me, and my mom didn't approve. I obviously didn't want to have nothing to do with it." Appellant said Yrigollen always cut him off before he could finish his explanation. She would tell appellant, " 'No. Stop right there,' " and would not let him finish what he was trying to say. Appellant said he did not tell Michael Lopez that he shot George Ganas. At one point in time, Lopez got drunk on tequila and began accusing appellant of killing Ganas. Appellant said he does not drink tequila and did not get "wasted" with Lopez by drinking tequila. However, he admitted getting drunk with Lopez on beer.

The victim's sister, Alexandra Ganas, testified for the defense. At 7:00 a.m. on April 5, 2004, she was at her brother, George's, home. He gave her a ride to the convalescent home near the music store where their mother worked, so Alexandra could pick up her mother's truck. When they arrived at the convalescent home, Alexandra asked her brother for some money for gas for the truck. Alexandra said Ganas reached under the seat of his car and pulled out a metal box. The box contained rent money, a gun, and two bags of marijuana. Ganas removed the gun from the box to get access to the money.

Alexandra learned of her brother's death later that day. She returned to the convalescent home to pick up her mother, who got off work between 2:30 and 3:00 p.m. Rick Gallegos was at the convalescent home and "yell[ed] that George had been shot and to get to the hospital."

People v. Esparza, 2012 Cal. App. Unpub. LEXIS 4319, 1-19 (June 11, 2012).

## III. **DISCUSSION**

### A. **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in

1 custody pursuant to the judgment of a state court if the custody is in violation of the

2 Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. §

3 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he

4 suffered violations of his rights as guaranteed by the U.S. Constitution. (Pet.) In

5 addition, the conviction challenged arises out of the Madera County Superior Court,

6 which is located within the jurisdiction of this court. 28 U.S.C. § 2241(d); 2254(a).

7 Accordingly, this Court has jurisdiction over the instant action.

8       **B.**    **Legal Standard of Review**

9     On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

10 Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

11 filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood,

12 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment

13 of the AEDPA and is therefore governed by AEDPA provisions.

14     Under AEDPA, a person in custody under a judgment of a state court may only be

15 granted a writ of habeas corpus for violations of the Constitution or laws of the United

16 States. 28 U.S.C. § 2254(a); Williams, 529 U.S. at 375 n. 7. Federal habeas corpus

17 relief is available for any claim decided on the merits in state court proceedings if the

18 state court's adjudication of the claim:

19
20     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

21
22     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

23 28 U.S.C. § 2254(d).

24       1.    Contrary to or an Unreasonable Application of Federal Law

25     A state court decision is "contrary to" federal law if it "applies a rule that

26 contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

27 that [are] materially indistinguishable from [a Supreme Court case] but reaches a

28 different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at

1    405-06).    "AEDPA does not require state and federal courts to wait for some nearly

2    identical factual pattern before a legal rule must be applied . . . The statute recognizes . .

3    . that even a general standard may be applied in an unreasonable manner."   Panetti v.

4    Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).   The

5    "clearly established Federal law" requirement "does not demand more than a 'principle'

6    or 'general standard.'"   Musladin v. Lamarque, 555 F.3d 830, 839 (2009).   For a state

7    decision to be an unreasonable application of clearly established federal law under §

8    2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

9    (or principles) to the issue before the state court.   Lockyer v. Andrade, 538 U.S. 63, 70-

10   71 (2003).   A state court decision will involve an "unreasonable application of" federal

11   law only if it is "objectively unreasonable."   Id. at 75-76 (quoting Williams, 529 U.S. at

12   409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).   In Harrington v. Richter, the

13   Court further stresses that "an *unreasonable* application of federal law is different from

14   an *incorrect* application of federal law."   131 S. Ct. 770, 785 (2011) (citing Williams, 529

15   U.S. at 410) (emphasis in original).   "A state court's determination that a claim lacks

16   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

17   correctness of the state court's decision."   Id. at 786 (citing Yarborough v. Alvarado, 541

18   U.S. 653, 664 (2004)).   Further, "[t]he more general the rule, the more leeway courts

19   have in reading outcomes in case-by-case determinations."   Id.; Renico v. Lett, 130 S.

20   Ct. 1855, 1864 (2010).   "It is not an unreasonable application of clearly established

21   Federal law for a state court to decline to apply a specific legal rule that has not been

22   squarely established by this Court."   Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

23   (2009) (quoted by Richter, 131 S. Ct. at 786).

24                    2.    Review of State Decisions

25        "Where there has been one reasoned state judgment rejecting a federal claim,

26   later unexplained orders upholding that judgment or rejecting the claim rest on the same

27   grounds."   See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).   This is referred to as the

28   "look through" presumption.   Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

1  (9th Cir. 2006).   Determining whether a state court's decision resulted from an

2  unreasonable legal or factual conclusion, "does not require that there be an opinion from

3  the state court explaining the state court's reasoning."  Richter, 131 S. Ct. at 784-85.

4  "Where a state court's decision is unaccompanied by an explanation, the habeas

5  petitioner's burden still must be met by showing there was no reasonable basis for the

6  state court to deny relief."  Id.  "This Court now holds and reconfirms that § 2254(d) does

7  not require a state court to give reasons before its decision can be deemed to have been

8  'adjudicated on the merits.'"  Id.

9  Richter instructs that whether the state court decision is reasoned and explained,

10  or merely a summary denial, the approach to evaluating unreasonableness under §

11  2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

12  or theories supported or, as here, could have supported, the state court's decision; then

13  it must ask whether it is possible fairminded jurists could disagree that those arguments

14  or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786.

15  Thus, "even a strong case for relief does not mean the state court's contrary conclusion

16  was unreasonable."  Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

17  authority to issue the writ in cases where there is *no possibility* fairminded jurists could

18  disagree that the state court's decision conflicts with this Court's precedents."  Id.

19  (emphasis added).  To put it yet another way:

20  
21  
22  

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

23  Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

24  are the principal forum for asserting constitutional challenges to state convictions."  Id. at

25  787.   It follows from this consideration that § 2254(d) "complements the exhaustion

26  requirement and the doctrine of procedural bar to ensure that state proceedings are the

27  central process, not just a preliminary step for later federal habeas proceedings."  Id.

28  (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977)).

1

3.      Prejudicial Impact of Constitutional Error

2       The prejudicial impact of any constitutional error is assessed by asking whether

3  the error had "a substantial and injurious effect or influence in determining the jury's

4  verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551

5  U.S. 112, 121-22 (2007) (holding that the <u>Brecht</u> standard applies whether or not the

6  state court recognized the error and reviewed it for harmlessness).  Some constitutional

7  errors, however, do not require that the petitioner demonstrate prejudice.  <u>See</u> <u>Arizona v.</u>

8  <u>Fulminante</u>, 499 U.S. 279, 310 (1991); <u>United States v. Cronic</u>, 466 U.S. 648, 659

9  (1984).

10  **IV.   REVIEW OF PETITION**

11       **A.      Claim One: Jury Instructions – Accomplice Testimony**

12       Petitioner claims that the trial court failed to give appropriate jury instructions

13  regarding the testimony of Christian Arias, based on Arias being an accomplice to the

14  crime. (Pet. at 6.)

15              1.      State Court Decision

16       The claim was denied in a reasoned decision by the Court of Appeal (<u>People v.</u>

17  <u>Perkins</u>, 2012 Cal. App. Unpub. LEXIS 3735) and in a subsequent petition for review

18  filed with California Supreme Court. (Lodged Docs. 4-5.) "[W]here there has been one

19  reasoned state judgment rejecting a federal claim, later unexplained orders upholding

20  that judgment or rejecting the claim rest on the same grounds."  <u>See</u> <u>Ylst v.</u>

21  <u>Nunnemaker</u>, 501 U.S. 797, 803 (1991).   This is referred to as the "look through"

22  presumption.  <u>Id.</u> at 804.  Since the Court of Appeal was the last court to issue a

23  reasoned opinion on this issue, this Court "looks through" the California Supreme Court

24  decision to the reasoned analysis of the Court of Appeal. In the last reasoned decision

25  denying Petitioner's claim, the appellate court explained:

26       I. THE TRIAL COURT DID NOT COMMIT REVERSIBLE ERROR BY
         FAILING TO INSTRUCT THE JURY SUA SPONTE ON WHETHER A
27       MINOR   TRAVELING   IN   APPELLANT'S   VEHICLE   WAS   AN
         ACCOMPLICE TO THE CRIMES.
28

Appellant contends the trial court violated his constitutional right to have every fact determined by the jury when it failed to instruct the jury sua sponte that the jury was required to determine whether C.A. was an accomplice to the crime.

A.      Appellant's Specific Contention

Appellant submits the expert testimony of Officer Dilbeck supported the idea that C.A. was an accomplice. Dilbeck testified that on the day of the homicide, appellant was in Rodriguez's car with four other gang members, implying that C.A. was also a VLS member. Dilbeck said it is common for Surenos gang members to commit crimes together because it goes to the "fear aspect" of gang mentality. Dilbeck explained that people are afraid of gangs because they commit their crimes "in numbers." According to Dilbeck, gang members are emboldened to commit crimes of violence when they are together in numbers.

On appeal, appellant contends the trial court committed reversible error by not instructing the jury to determine whether C.A. was an accomplice. In appellant's view, there was evidence from which jurors could have found that C.A. was a gang member who knew the criminal purpose of the person who fired the shots and who provided encouragement and support for the shooting. Appellant further contends: "Had appellant's jury been properly instructed on principles for evaluating accomplice testimony, jurors would have recognized that there was insufficient evidence to corroborate [C.A.'s] claim that appellant was the person who fired the fatal shots. Failure to properly instruct the jury on the corroboration requirement in section 1111 caused a miscarriage of justice."

B. Law of Accomplice Testimony

Penal Code section 1111 defines an accomplice "as one who is liable to prosecution for the identical offense charged against the defendant ...." The section further provides: "A conviction cannot be had upon the testimony of an accomplice unless it can be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

""[W]henever the testimony given upon the trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice,' " the trial court must instruct the jury, sua sponte, to determine whether the witness was an accomplice. [Citation.] If the testimony establishes that the witness was an accomplice as a matter of law, the jury must be so instructed. [Citation.] In either case, the trial court also must instruct the jury, sua sponte, '(1) that the testimony of the accomplice witness is to be viewed with distrust [citations], and (2) that the defendant cannot be convicted on the basis of the accomplice's testimony unless it is corroborated ....' [Citation.]" (People v. Zapien (1993) 4 Cal.4th 929, 982.)

"Whether a person is an accomplice within the meaning of [Penal Code] section 1111 presents a factual question for the jury 'unless the evidence permits only a single inference.' [Citation.] Thus, a court can

decide as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are 'clear and undisputed.' [Citations.]" (People v. Williams (1997) 16 Cal.4th 635, 679.)

"[W]hen an accomplice is called to testify on behalf of the prosecution, the court must instruct the jurors that accomplice testimony should be viewed with distrust. [Citation.]" (People v. Guiuan (1998) 18 Cal.4th 558, 565.) In other words, the trial court has a sua sponte duty to instruct with CALCRIM No. 334 when warranted by the evidence. (People v. Boyer (2006) 38 Cal.4th 412, 466.) The corroboration requirement of Penal Code section 1111 is a collateral factual issue, not an element of the charged offenses that must be proven beyond a reasonable doubt. (People v. Frye (1998) 18 Cal.4th 894, 967.) "[F]ailure to instruct on accomplice liability under [Penal Code] section 1111 is harmless if there was adequate corroboration of the witness." (People v. Brown (2003) 31 Cal.4th 518, 557.)

With respect to the standard of review, appellant initially acknowledges: "[T]he California Supreme Court has held instructions on the corroboration requirement in section 1111 do not define an element of the charged offense and thus do not involve the federal Constitution. (People v. Frye[, supra,] 18 Cal.4th [at pp.] 968-969, overruled on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22 ...." Appellant nevertheless contends: "Because accomplice status of a prosecution witness is intertwined with proof of the defendant's guilt, error in failing to instruct on those principles violates the federal Constitution, bringing the Chapman standard of harmless error analysis [Chapman v. California (1967) 386 U.S. 18] into play." "[T]he requirement under [Penal Code] section 1111 that 'a conviction cannot be had upon the testimony of an accomplice unless it be corroborated' is a matter of state law, which does not implicate a federal constitutional right. [Citations.]" (Barco v. Tilton (C.D.Cal. 2010) 694 F.Supp.2d 1122, 1136.) If a trial court's alleged instructional error violates only California law, the standard is that stated in People v. Watson (1956) 46 Cal.2d 818, 836, which permits the People to avoid reversal unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (See People v. Simon (1995) 9 Cal.4th 493, 506, fn. 11.)

C. Analysis

Here, it is highly questionable whether C.A. was liable to prosecution for the identical offense — murder — charged against the appellant in count 1. (§ 1111.) Even if C.A. was subject to such prosecution, the court's "failure to instruct on accomplice liability ... is harmless if there was adequate corroboration of the witness." (People v. Brown, supra, 31 Cal.4th at p. 557.) As noted above, In June 2004, Lopez and appellant had a fight after appellant made some comments about the Ganas shooting. Lopez said he and appellant were drunk on tequila at the time. Lopez did not think that appellant was aware of his friendship with Ganas. Lopez was under the impression that appellant was visiting in Mexico, but appellant said he had done something wrong. Appellant went on to tell Lopez "[t]hat it was a car full of guys and then [appellant] shot ...." Upon further questioning by the prosecutor, Lopez affirmed that the car was full of guys, and that appellant was the one who shot Ganas. In addition, Yrigollen immediately notified Madera police that appellant was

1

2

in Mexico when she saw the advertisement in the Madera Tribune about the Ganas murder. The information that Yrigollen provided led to the apprehension of appellant.

3

4

5

Even if we assume that C.A. was an accomplice to the murder, the testimony of Michael Lopez corroborated the testimony of C.A., and it is not reasonably probable that a result more favorable to the appellant would have been reached had the court instructed sua sponte on the law of accomplice testimony pursuant to section 1111.

6

People v. Esparza, 2012 Cal. App. Unpub. LEXIS 4319 at 19-26.

7

2.   Analysis

8

9

Petitioner claims his conviction cannot stand because it was supported by the uncorroborated testimony of accomplice Christian Arias. In federal court "a conviction may be based on the uncorroborated testimony of an accomplice." United States v. Turner, 528 F.2d 143, 161 (9th Cir. 1975); see also Caminetti v. United States, 242 U.S. 470, 495, 37 S. Ct. 192, 61 L. Ed. 442 (1917) ("there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them."); United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993) ("The uncorroborated testimony of an accomplice is enough to sustain a conviction unless it is incredible or insubstantial on its face"). California Penal Code § 1111, which requires corroboration of accomplice testimony, is a "state law requirement" which is "not required by the Constitution or federal law." Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000). Petitioner's claim that uncorroborated accomplice testimony was improperly used to support his conviction is based solely on a perceived error of state law and is therefore not cognizable in this federal habeas corpus proceeding. Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Because the testimony of Petitioner's co-defendant was neither incredible nor insubstantial on its face, Petitioner is only entitled to habeas corpus relief if the state court's alleged violation of state law denied him his due process right to fundamental fairness. Laboa, 224 F.3d at 979. The evidence introduced at Petitioner's trial, including the testimony of his accomplice, was sufficient to support his convictions. See Jackson v.

25

26

27

28

1  _Virginia_, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (there is sufficient

2  evidence to support a conviction if, "after viewing the evidence in the light most favorable

3  to the prosecution, any rational trier of fact could have found the essential elements of

4  the crime beyond a reasonable doubt.").

5         Further, "[a] State violates a criminal defendant's due process right to

6  fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement."

7  _Laboa_, 224 F.3d at 979 (citing _Hicks v. Oklahoma_, 447 U.S. 343, 346, 100 S. Ct. 2227,

8  65 L. Ed. 2d 175 (1980)). State criminal procedures do not violate the Due Process

9  Clause unless they "offend[] some principle of justice so rooted in the traditions and

10  conscience of our people as to be ranked as fundamental." _Montana v. Egelhoff_, 518

11  U.S. 37, 43, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996). The California Court of Appeal

12  carefully reviewed the evidence and determined that, under state law, sufficient evidence

13  corroborated the accomplice testimony. This determination by the Court of Appeal is

14  supported by the facts of this case and does not constitute an arbitrary denial of a state

15  law entitlement. Further, the court's ruling does not offend any fundamental principle of

16  justice or render Petitioner's trial fundamentally unfair. Petitioner is not entitled to relief

17  on his claim that there was insufficient evidence based on the lack of corroboration of

18  accomplice testimony to support his conviction.

19         **B.     Claim Two: Ineffective Assistance of Counsel**

20         Petitioner, in his second claim, contends that his trial counsel was ineffective for

21  failing to object to the testimony of Virginia Yrigollen regarding her statements that she

22  believed that Petitioner wanted to confess to her. (Pet. at 8.)

23                 1.     State Court Decision

24         Petitioner presented his claim by way of direct appeal to the California Court of

25  Appeal, Fifth Appellate District. The claims were denied in a reasoned decision by the

26  Court of Appeal (_People v. Perkins_, 2012 Cal. App. Unpub. LEXIS 3735) and in a

27  subsequent petition for review filed with California Supreme Court. (Lodged Docs. 4-5.)

28  Since the Court of Appeal was the last court to issue a reasoned opinion on these

1    issues, this Court "looks through" the California Supreme Court decision to the reasoned

2    analysis of the Court of Appeal.

3        With regard to the ineffective assistance of counsel claim, the Court of Appeal

4    said in its opinion:

5        III.   DEFENSE   COUNSEL   DID   NOT   RENDER   INEFFECTIVE
         ASSISTANCE BY FAILING TO OBJECT TO TESTIMONY OF A
6        PROSECUTION WITNESS THAT SHE BELIEVED APPELLANT WAS
         ABOUT TO CONFESS TO HER IN JUNE 2004.
7
8            Appellant contends he was denied his constitutional right to the
         effective assistance of counsel when his counsel failed to object to the
9        testimony of Virginia Yrigollen "that she believed appellant was about to
         confess to her when she told him to stop talking."

10           A. Yrigollen's Testimony

11           As noted above, Yrigollen testified that she lived with her boyfriend,
         Franco near Mexicali, Mexico in 2004. Their residence was about three
12       and one-half miles from the U.S./Mexico border. She said her son, Lopez,
         visited occasionally, and that Franco was appellant's uncle. Both Yrigollen
13       and Lopez testified that appellant goes by the nickname "Poncho."
         Yrigollen said appellant arrived at her home in June 2004 and stayed
14       about a month. Appellant would also stay at an aunt's house in the
         Mexicali area. Yrigollen said appellant's mother would come to Mexicali
15       and leave money and groceries for appellant.

16           Yrigollen said she was a close friend of the mother of Ganas.
         Yrigollen had known Ganas his entire life and knew he had been shot in
17       Madera. In June 2004, Yrigollen asked appellant about the Ganas
         shooting, but appellant said he did not remember much. Appellant claimed
18       he had been at home when some friends stopped by to pick him up.
         Yrigollen said she stopped appellant from giving a explanation because
19       she had a hard time believing his version of events. Yrigollen said she was
         shocked and upset and really did not want to know what had happened to
20       Ganas. Yrigollen said appellant was making himself look bad by running
         and told him he should go back and clear matters up. Although appellant
21       did not respond to her advice, Yrigollen said appellant looked at her and
         "he knew it needed to be done."
22
             B. Appellant's Motion for New Trial
23
24           On September 9, 2010, appellant filed a motion for new trial (§§
         1179, 1181) and asserted that his trial counsel was ineffective by failing to
25       object on Evidence Code section 352 grounds to the "entirely irrelevant"
         testimony of Virginia Yrigollen. He argued in his new trial motion: "The
26       mere fact that [Yrigollen] thought that he was about to confess does not
         make the statement admissible. The meaning of the defendant's
27       statement is ambiguous and should have been excluded." The trial court
         denied the new trial motion on that ground stating: "[T]he fact that she
28       made a statement and then she said that she stopped, I don't find that to
         be unduly prejudicial, and I don't think that was subject to an objection at

that point. She may have had some thoughts about what that meant, but the fact that she would not take further information meant that she didn't get further information, and that may have actually worked to the benefit of the defense. But I don't find prejudice in the statement as made on the record."

C. Law of Ineffective Assistance

According to appellant's opening brief, Yrigollen claimed that he confessed to her. He maintains that a timely objection by his trial counsel would have excluded testimony that "created a substantial danger of prejudice and confusion." To succeed on a claim of ineffective assistance of counsel, an appellant must show, first, that his trial counsel's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional standards, and second, that counsel's deficient representation caused him prejudice. (Strickland v. Washington (1984) 466 U.S. 668, 688, 694; In re Emilye A. (1992) 9 Cal.App.4th 1695, 1711.) To show prejudice, an appellant must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been more favorable to the appellant. (In re Emilye A., supra, at p. 1711; In re Dennis H. (2001) 88 Cal.App.4th 94, 98.)

"'A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citation.] There are countless ways to provide effective assistance in any given case.'" (People v. Lewis (1990) 50 Cal.3d 262, 288, quoting Strickland v. Washington, supra, 466 U.S. at p. 689.) "[A]n ineffective assistance claim may be reviewed on direct appeal where 'there simply could be no satisfactory explanation' for trial counsel's action or inaction. [ Citation.]" (In re Dennis H., supra, 88 Cal.App.4th at p. 98, fn. 1.)

D. Analysis

Appellant has failed to show deficient performance by trial counsel or prejudice in this case. Despite appellant's claims to the contrary, Yrigollen never expressly said that she thought appellant was about to confess to her. At most, the testimony was relevant to explain appellant's flight to Mexico after the shooting of Ganas and explained Yrigollen's conduct in contacting Crime Stoppers after seeing a newspaper article about the shooting of Ganas. Yrigollen said she asked appellant about the Ganas shooting in June 2004. At that time, appellant told Yrigollen he did not remember much. Yrigollen told appellant he was making himself look bad "running like this" and encouraged him to "go back, clear it up ...." According to Yrigollen, appellant "looked at me. He knew ... it needed to be done, you know." Even if trial counsel had interposed a timely, successful objection to Yrigollen's testimony, it is not reasonably probable a result more favorable to appellant would have occurred.

18

People v. Esparza, 2012 Cal. App. Unpub. LEXIS 4319 at 28-33.

2.      Law Applicable to Ineffective Assistance of Counsel Claims

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998).  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the Court must consider two factors. Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 687; see also, Harrington v. Richter, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694.  Petitioner must show that counsel's errors were "so serious as to deprive defendant of a fair trial, a trial whose result is reliable."  Id. at 687.  The Court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1348; United States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any

19

1   deficiency that does not result in prejudice must necessarily fail.  However, there are

2   certain instances which are legally presumed to result in prejudice, e.g., where there has

3   been an actual or constructive denial of the assistance of counsel or where the State has

4   interfered with counsel's assistance.  Id. at 692; United States v. Cronic, 466 U.S., at

5   659, and n. 25 (1984).

6       As the Supreme Court reaffirmed recently in Harrington v. Richter, meeting the

7   standard for ineffective assistance of counsel in federal habeas is extremely difficult:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." Williams, supra, at 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251, 261 (2009) (internal quotation marks omitted).

21   Harrington v. Richter, 131 S. Ct. at 785-86.

22       "It bears repeating that even a strong case for relief does not mean the state

23   court's contrary conclusion was unreasonable."  Id. at 786.  "As amended by AEDPA, §

24   2254(d) stops short of imposing a complete bar on federal court relitigation of claims

25   already rejected in state proceedings."  Id.  "As a condition for obtaining habeas corpus

26   from a federal court, a state prisoner must show that the state court's ruling on the claim

27   being presented in federal court was so lacking in justification that there was an error

28   well understood and comprehended in existing law beyond any possibility for fairminded

1  disagreement." Id. at 786-87.

2        Accordingly, even if Petitioner presents a strong case of ineffective assistance of

3  counsel, this Court may only grant relief if no fairminded jurist could agree on the

4  correctness of the state court decision.

5              3.    Analysis

6        The state court denied the claim by finding that Petitioner did not establish that he

7  was prejudiced by the actions of counsel. The statements made by Yrigollen at trial were

8  summarized in the state court decision. (See Rep. Tr. at 335-50.) As described,

9  Petitioner came to stay with Yrigollen in Mexico in June 2004, a couple months after the

10  shooting. (Id.) Yrigollen was a close friend of the victim's mother, and asked Petitioner

11  about the shooting. (Id.) Petitioner responded that he did not remember much, and

12  Yrigollen prevented him from telling her more. Suspecting that Petitioner had some

13  involvement in the shooting, Yrigollen told Petitioner that it looked bad that he fled, and

14  that he should "clear up" what is going on. (Id.) Finally, Yrigollen stated that Petitioner

15  looked at her, and she sensed that Petitioner knew "what needed to be done." (Id.)

16        On cross-examination defense counsel elicited testimony from Yrigollen that even

17  if she suspected that Petitioner was involved in the shooting, she waited to call a crime

18  hotline and tell authorities about Petitioner until four years later, in 2008. (Rep. Tr. at

19  346-47.) Further, defense counsel questioned Yrigollen regarding her own criminal

20  activity, including a pending charge for drug possession at the time of her testimony. (Id.)

21        Based on the testimony provided by Yrigollen, the state court found that Petitioner

22  could not show that defense counsel was ineffective for failing to object, or that he was

23  prejudiced by the testimony provided so that the results of the trial would be different.

24        The Court agrees. Yrigollen's testimony was vague, and at no point did she state

25  that Petitioner confessed to her. While the testimony provided the jury information that

26  Petitioner had fled the country shortly after the shooting, Yrigollen provided no further

27  information regarding the facts surrounding the shooting. Further, her statements that

28  Petitioner needed to clear things up and that Petitioner knew what he needed to do

1   lacked specificity, and could have just have likely indicated that Yrigollen thought that

2   Petitioner, if he knew what happened at the shooting, needed to speak with law

3   enforcement, regardless of whether he was implicated in the shooting or not.

4          This testimony was not highly prejudicial to Petitioner. While the evidence of flight

5   might have been circumstantial evidence of his guilt, the testimony was not strong, and

6   the fact that Petitioner visited his uncle, in and of itself, was not overly suspicious.

7   Moreover, the testimony had little impact on the result in light of the much stronger

8   evidence of the prosecution witness Christian Arias. Arias testified that while seated in

9   the car with Petitioner, he observed Petitioner shoot the victim.

10          Petitioner has not met his burden of showing that but for counsel being ineffective,

11   there was a "reasonable probability that... the result ... would have been different."

12   Strickland, 466 U.S. at 694. The prosecution presented strong evidence of Petitioner's

13   guilt based on the evidence presented regarding the retaliatory shooting of a rival gang

14   member. Based on the strong evidence presented of Petitioner's involvement in the

15   crime of conviction, it is unlikely that jurors would have not found Petitioner guilty if his

16   counsel would have objected to testimony from Yrigollen that implicated that Petitioner

17   was involved and needed to speak to law enforcement. In light of the other testimony

18   presented at trial, including eyewitness testimony of the shooting itself, the state court

19   was reasonable in finding that any potential prejudice from counsel's failure to object to

20   any of Yrigollen's testimony was harmless.

21          Fairminded jurists could therefore disagree with the correctness of the state court

22   decision that counsel's failure to object to the admission of the testimony as not "so

23   serious as to deprive defendant of a fair trial, a trial whose result is reliable." Strickland,

24   466 U.S. at 687. Petitioner's claim of ineffective assistance of counsel is without merit.

25          **C.      Claim Three: Failure To Provide Jury Instructions**

26          Petitioner, in his third claim, contends that the trial court committed prejudicial

27   error in failing to instruct sua sponte on voluntary manslaughter based on a sudden

28   quarrel or heat of passion. (Pet. at 9-10.)

1          1.      State Court Decision

Petitioner presented his claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claims were denied in a reasoned decision by the Court of Appeal (People v. Esparza, 2012 Cal. App. Unpub. LEXIS 4319 at 33-36) and in a subsequent petition for review filed with California Supreme Court (Lodged Docs. 4-5.) Since the Court of Appeal was the last court to issue a reasoned opinion on these issues, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal.

With regard to the jury instruction claim, the Court of Appeal said in its opinion:

IV. THE TRIAL COURT DID NOT COMMIT REVERSIBLE ERROR BY FAILING TO INSTRUCT THE JURY SUA SPONTE ON VOLUNTARY MANSLAUGHTER BASED ON A SUDDEN QUARREL OR HEAT OF PASSION.

Appellant contends the trial court committed reversible error by failing to instruct sua sponte on voluntary manslaughter based on sudden quarrel or heat of passion.

A. Reported Instructional Conference

At the reported conference on jury instructions, trial counsel advised the court, "Your Honor, just to be specific, we're not requesting an instruction for voluntary manslaughter as a lesser included. I think that was what we discussed and wanted to put on the record." The prosecutor added that the defense was not asking for self-defense instructions because self-defense would be inconsistent with the defendant's theory of the case. Appellant's trial counsel concurred, saying, "That is correct, Your Honor. We're not requesting the instruction, and it would, in fact, be inconsistent with our theory."

B. Law of Invited Error

"When a defense attorney makes a 'conscious, deliberate tactical choice' to forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was omitted in error. [Citations.]" (People v. Wader (1993) 5 Cal.4th 610, 657-658.) In the context of voluntary manslaughter instructions, " 'the doctrine of invited error ... applies if the court accedes to a defense attorney's tactical decision to request that lesser included offense instructions not be given' [citation] ...." (People v. Castaneda (2011) 51 Cal.4th 1292, 1330 (Castaneda).)

C. Analysis

Appellant claims the rule of Castaneda does not apply in his case because "trial counsel provided no tactical reason for not requesting instructions on voluntary manslaughter." Accepting appellant's contention

23

as correct for purposes of this argument, the next question is whether sua sponte instructions on voluntary manslaughter were called for in this case.

"Voluntary manslaughter 'is the unlawful killing of a human being without malice,' committed 'upon a sudden quarrel or heat of passion.' (§ 192, subd. (a.).) [T]o establish the crime of voluntary manslaughter, there must be evidence that (1) the defendant killed in the heat of passion, and (2) such passion would be aroused in an ordinarily reasonable person under the circumstances. [Citation.]" (<u>Castaneda</u>, supra, 51 Cal.4th at pp. 1330-1331.) " 'The provocation which incites a defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.' [Citation.] '[T]he victim must taunt the defendant or otherwise initiate the provocation.' [Citations.] The ' "heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances ...." ' [Citation.]" (<u>People v. Avila</u> (2009) 46 Cal.4th 680, 705.)

In this case, appellant claims the provocation consisted of bad looks and the throwing of a gang sign by Norteno gang members at the mini-mart. He also contends George Ganas walked "real slow" in front of Rodriguez's vehicle, acted tough, and placed his hands in his waistband, as if he were reaching for weapon. Such conduct falls short of taunting or the initiation of provocation, and any heat of passion engendered by Ganas's actions was not such passion "as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances." (<u>People v. Avila</u>, supra, 46 Cal.4th at p. 705.) The evidence was simply insufficient to justify a sua sponte instruction on voluntary manslaughter and reversal for instructional error is not required.

<u>People v. Esparza</u>, 2012 Cal. App. Unpub. LEXIS 4319 at 33-36.

2.    Analysis

To the extent Petitioner alleges the instructional claim violated state law, Petitioner's claim is not cognizable in this proceeding. The Supreme Court has held that a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. <u>Estelle v. McGuire</u>, 502 U.S. at 71-72. A claim that an instruction was deficient in comparison to a state model or that a trial judge incorrectly interpreted or applied state law governing jury instructions does not entitle one to relief under § 2254, which requires violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. §§ 2254(a), 2241(c)(3). Accordingly, to the extent that Petitioner raises state law claims, his claims should be dismissed.

Although the Supreme Court has held that the failure to instruct on lesser included offenses can constitute constitutional error in capital cases, <u>Beck v. Alabama</u>, 447 U.S.

625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), it has reserved decision on whether such an omission in non-capital cases constitutes constitutional error, id. at 638 n.7. When the Supreme Court has expressly reserved consideration of an issue, there is no Supreme Court precedent creating clearly established federal law relating to a petitioner's habeas claim. Alberni v. McDaniel, 458 F.3d 860, 864 (9th Cir. 2006). Therefore, a petitioner cannot rely on circuit authority, and there is no basis for relief pursuant to § 2254(d)(1) for an unreasonable application of clearly established federal law. Alberni v. McDaniel, 458 F.3d at 864; Brewer v. Hall, 378 F.3d 952, 955-57 (9th Cir. 2004).

Accordingly, there is no clearly established federal law within the meaning of § 2254(d) concerning a state court's rejection of a claim that Sixth and Fourteenth Amendment rights in a non-capital case were violated by a failure to instruct on a lesser included offense. Thus, such a claim is not cognizable in a proceeding pursuant to 28 U.S.C. § 2254 and is subject to dismissal. Windham v. Merkle, 163 F.3d 1092, 1105-06 (9th Cir. 1998).

Further, the absence of the instruction did not result in any fundamental unfairness. The only basis for federal collateral relief for instructional error is that an infirm instruction or the lack of instruction by itself so infected the entire trial that the resulting conviction violates due process. Estelle v. McGuire, 502 U.S. at 71-72; Cupp v. Naughten, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973); see Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974) (it must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some right guaranteed to the defendant by the Fourteenth Amendment). The Court in Estelle emphasized that the Court had very narrowly defined the category of infractions that violate fundamental fairness, and that beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. 502 U.S. at 72-73.

However, when habeas is sought under 28 U.S.C. § 2254, a failure to instruct on the defense theory of the case constitutes error if the theory is legally sound and

1  evidence in the case makes it applicable. Clark v. Brown, 450 F.3d 898, 904 (9th Cir.

2  2006); see Mathews v. United States, 485 U.S. 58, 63, 108 S. Ct. 883, 99 L. Ed. 2d 54

3  (1988) (reversing a conviction and holding that even if a defendant denies one or more

4  elements of the crime, he is entitled to an entrapment instruction whenever there is

5  sufficient evidence from which a reasonable jury could find entrapment, and the

6  defendant requests such an instruction).

7      Petitioner contends that the trial court should have sua sponte instructed the jury

8  with regard to heat of passion voluntary manslaughter. Petitioner argues that the

9  provocation was based on the fact that the victim exchanged "bad looks," was acting

10  tough, and making gestures including making gang signs and putting his hands in his

11  pants near the waist. (See Rep. Tr. at 67-68, 72-73, 112-114.) Upon review, the state

12  court found that the victim's actions fell short of the provocation required, and that any

13  heat of passion engendered from his actions was not such passion as would be aroused

14  in the mind of an ordinarily reasonable person. People v. Esparza, 2012 Cal. App.

15  Unpub. LEXIS 4319 at 33-36. The state court holding was in accord with state law that

16  ordinarily reasonable people do become provoked by gang references or challenges.

17  See People v. Avila, 46 Cal. 4th 680, 706 (2009) ("Even assuming it was reference to a

18  gang, and that a gang member might have perceived the statement as some sort of a

19  challenge, the requisite provocation must be one that would provoke an ordinarily

20  reasonable person. Reasonable people do not become homicidally enraged when

21  hearing the term 'Carmelos,' even if it is understood as a fleeting gang reference or

22  challenge.") (citation omitted.) The instruction was not applicable here, and further

23  defense counsel stated that the theory of provocation would be inconsistent with the

24  defense strategy.

25      Petitioner has not shown that he suffered any fundamental unfairness or that the

26  omission had any substantial or injurious effect or influence in determining the jury's

27  verdict. Accordingly, it will be recommended that the Court deny Petitioner's claim

28

1    concerning the failure to instruct on the lesser included offense of voluntary

2    manslaughter.

3          **D.      Claim Four: Cumulative Error**

4          In his final claim for relief, Petitioner argues that the cumulative effect of the errors

5    at his trial violated his right to due process and a fair trial. (Pet. at 11.)

6          In the last reasoned decision denying Petitioner's claim, the appellate court held:

7          V. REVERSAL IS NOT COMPELLED BY ASSERTED CUMULATIVE
           ERROR.
8
                 Appellant contends the cumulative effect of errors committed at trial
9          violated his right to due process of law under the 14th Amendment to the
           United States Constitution.
10
                 We have concluded that no prejudicial error occurred. Accordingly,
11         there was no error to cumulate to appellant's prejudice. (People v.
           Sanders (1995) 11 Cal.4th 475, 565; People v. Cudjo (1993) 6 Cal.4th
12         585, 630.)

13   People v. Esparza, 2012 Cal. App. Unpub. LEXIS 4319.

14         The Ninth Circuit has concluded that under clearly established United States

15   Supreme Court precedent, the combined effect of multiple trial errors may give rise to a

16   due process violation if it renders a trial fundamentally unfair, even where each error

17   considered individually would not require reversal. Parle v. Runnels, 505 F.3d 922, 927

18   (9th. Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40

19   L. Ed. 2d 431 (1974) and Chambers v. Mississippi, 410 U.S. 284, 290, 93 S. Ct. 1038,

20   35 L. Ed. 2d 297 (1973)). See also Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011) (if

21   no error of constitutional magnitude occurred at trial, "no cumulative prejudice is

22   possible"). "The fundamental question in determining whether the combined effect of trial

23   errors violated a defendant's due process rights is whether the errors rendered the

24   criminal defense 'far less persuasive,' Chambers, 410 U.S. at 294, and thereby had a

25   'substantial and injurious effect or influence' on the jury's verdict." Parle, 505 F.3d at 927

26   (quoting Brecht, 507 U.S. at 637).

27         This Court has addressed each of Petitioner's claims raised in the instant petition

28   and has concluded that no error of constitutional magnitude occurred at his trial in state

court. This Court also concludes that the errors alleged by Petitioner, even when considered together, did not render his defense "far less persuasive," nor did they have a "substantial and injurious effect or influence on the jury's verdict." Accordingly, Petitioner is not entitled to relief on his claim of cumulative error.

## IV.    RECOMMENDATION

Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be DENIED with prejudice.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014).


IT IS SO ORDERED.


Dated:   __August 4, 2015__          ____/s/ _Michael J. Seng_

UNITED STATES MAGISTRATE JUDGE